Nos. 22-1261, 22-1283

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

### AMERICAN MEDICAL RESPONSE OF CONNECTICUT, INC.

Petitioner/Cross-Respondent

v.

### NATIONAL LABOR RELATIONS BOARD

Respondent/Cross-Petitioner

_____

### ON PETITION FOR REVIEW AND CROSS-APPLIATION
### FOR ENFORCEMENT OF AN ORDER OF
### THE NATIONAL LABOR RELATIONS BOARD

_____

### BRIEF FOR THE NATIONAL LABOR RELATIONS BOARD

_____

**KIRA DELLINGER VOL**
*Supervisory Attorney*

**GREG P. LAURO**
*Attorney*

***National Labor Relations Board***
**1015 Half Street, SE**
**Washington, DC 20570**
**(202) 273-0656**
**(202) 273-2965**

**JENNIFER A. ABRUZZO**
    ***General Counsel***
**PETER SUNG OHR**
    ***Deputy General Counsel***
**RUTH E. BURDICK**
    ***Deputy Associate General Counsel***
**DAVID HABENSTREIT**
    ***Assistant General Counsel***

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| AMERICAN MEDICAL RESPONSE OF CONNECTICUT, INC. | ) ) ) | Case Nos.    22-1261<br>22-1283 |
| Petitioner/Cross-Respondent | ) ) | |
| v. | ) ) | Board Case No.<br>01–CA–263985 |
| NATIONAL LABOR RELATIONS BOARD | ) ) | |
| Respondent/Cross-Petitioner | ) ) | |

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), counsel for the National Labor Relations Board ("the Board") certify the following:

**A.    *Parties and Amici***:  American Medical Response of Connecticut, Inc. (AMR) was the respondent before the Board, and is the Petitioner in this Court proceeding.  The International Association of EMTs & Paramedics Local R1-999, NAGE/SEIU Local 5000 (the Union), was the charging party before the Board. The Board's General Counsel was a party before the Board.

**B.    *Rulings Under Review***:  The ruling under review is a Decision and Order of the Board, *American Medical Response of Connecticut, Inc.*, 371 NLRB No. 106, issued against AMR on June 10, 2022.

    **C.**    ***Related Cases***:  This case has not previously been before this Court.

The Board is not aware of any related cases pending or about to be presented to

this Court or any other court.

                                     /s/ Ruth E. Burdick
                                     Ruth E. Burdick
                                     Deputy Associate General Counsel
                                     NATIONAL LABOR RELATIONS BOARD
                                     1015 Half Street, SE
                                     Washington, DC 20570-0001
                                     (202) 273-2960

Dated at Washington, DC
this 23rd day of March 2023

## TABLE OF CONTENTS

**Headings**                                                             **Page(s)**

Statement of jurisdiction ............................................................................1

Statement of the issues ..............................................................................2

Relevant statutory provisions....................................................................2

Statement of the case.................................................................................2

   I.   The Board's findings of fact ............................................................2

      A.  Background: AMR's operations and the parties' collective-bargaining relationship ................................................3

      B.  The Union files a grievance in late 2019 regarding AMR's use of non-unit employees to perform New Haven-unit work ............................4

      C.  AMR invokes the Agreement's disaster provision during the COVID-19 crisis ....................................................4

      D.  The Union notices an increase in non-unit employees performing unit work while unit employees lose hours. ..............................5

      E.  The Union requests information and files subcontracting grievances; AMR refuses to provide four categories of information and denies the grievances. ....................................................6

          1.  The Union repeatedly raises its subcontracting and seniority concerns to AMR..................................7

          2.  The Union's May 7 information request ..............................8

          3.  The June 15 information request .......................................11

          4.  The July grievances and renewed information request......................11

          5.  AMR continues to withhold relevant requested information..............12

## TABLE OF CONTENTS (cont'd)

**Headings**                                                              **Page(s)**

6.  The July 22 information request..........................................................13

II.  Procedural history ......................................................................14

III.  The Board's conclusions and order .................................................15

Summary of argument...........................................................................16

Standard of review ...............................................................................17

Argument...............................................................................................18

Substantial evidence supports the Board's finding that AMR violated Section 8(a)(5) and (1) of the Act by refusing to furnish requested information relevant to the Union's representational duties ............18

A.  All of the requested information was relevant .......................................20

1.  Unit employees removed from the schedule or affected by brownouts.......................................................................24

a.   AMR does not dispute that the requested information regarding unit employees is presumptively relevant..................24

b.  In any event, the Union established the relevance of the unit-employee information................................................25

2.  New Haven call-volume data.........................................................30

3.  Unit work performed by non-unit employees ..................................32

4.  New Haven response times............................................................33

B.  AMR cannot justify withholding relevant information by arguing the merits of the Union's grievances.......................................36

ii

# TABLE OF CONTENTS (cont'd)

**Headings**                                                                                          **Page(s)**

C.   The Board acted well within its broad remedial discretion in
     ordering AMR to produce the relevant, requested information.............41

    1.   To preserve a confidentiality defense, an employer must timely
         assert, substantiate, and propose a way to accommodate its
         confidentiality interest ......................................................................43

    2.   AMR failed to preserve any confidentiality defense to
         producing the call-volume data .........................................................45

    3.   The Board reasonably ordered full production of the call-volume
         data rather than accommodative bargaining.....................................49

Conclusion ....................................................................................................54

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*ADT, LLC*,
   369 NLRB No. 31 (2020), 2020 NLRB LEXIS 86, *vacated and remanded on
   other grounds sub nom. IBEW v. NLRB*,
   9 F.4th 63 (2d Cir. 2021) ................................................................... 39

*Advancepierre Foods v. NLRB,*
   966 F.3d 813 (D.C. Cir. 2020) ........................................................... 42

*Bally's Park Place, Inc. v. NLRB*,
   646 F.3d 929 (D.C. Cir. 2011) .......................................................... 17

*Brewers & Maltsters, Local Union No. 6 v. NLRB*,
   414 F.3d 36 (D.C. Cir. 2005) ...................................................... 18, 19

*Columbia College Chicago*,
   360 NLRB 1116 (2014) .............................................................. 24, 26

*Country Ford Trucks, Inc. v. NLRB*,
   229 F.3d 1184 (D.C. Cir. 2000) ............................................ 20, 25, 26

*Crozer-Chester Med. Ctr. v. NLRB*,
   976 F.3d 276 (3d Cir. 2020) ................................... 21, 41, 43, 46, 48

*DaimlerChrysler Corp. v. NLRB*,
   288 F.3d 434 (D.C. Cir. 2002) ............................................. 19, 20, 24

*Delaware Cty. Mem. Hosp.*,
   366 NLRB No. 28 (2018), 2018 NLRB LEXIS 118, *enforced in relevant part
   sub. nom. Crozer-Chester Med. Ctr. v. NLRB*,
   976 F.3d 276 (3d Cir. 2020). ............................................................. 48

*Detroit Edison Co. v. NLRB*,
   440 U.S. 301 (1979) ......................................................................... 43

*Detroit Newspaper Agency*,
   317 NLRB 1071 (1995) ........................................................ 45, 47, 50

## TABLE OF AUTHORITIES (cont'd)

**Cases**                                                    **Page(s)**

*Disneyland Park*,
   350 NLRB 1256 (2007) ........................................................................ 19, 21, 34

*Dunkin' Donuts Mid-Atlantic Distrib. Ctr., Inc. v. NLRB*,
   363 F.3d 437 (D.C. Cir. 2004) ......................................................... 24

*E.I. du Pont de Nemours & Co. v. NLRB*,
   489 F.3d 1310 (D.C. Cir. 2007) ...................................................... 41

*Emery Indus.*,
   268 NLRB 824 (1984) ...................................................................40

*Enter. Leasing Co. v. NLRB*,
   831 F.3d 534 (D.C. Cir. 2016) ......................................................... 17

*Fibreboard Prods. Corp. v. NLRB*,
   379 U.S. 203 (1964) ....................................................................... 42

*Gen. Elec. Co. v. NLRB*,
   916 F.2d 1163 (7th Cir. 1990) ......................................................... 45

*Holly Farms Corp. v. NLRB*,
   517 U.S. 392 (1996) ....................................................................... 17

*Howard Indus., Inc.*,
   360 NLRB 891 (2014) ............................................................... 44, 501

*Lasher Serv. Corp.*,
   332 NLRB 834 (2002) ............................................................. 43, 47, 50

*Leonard B. Herbert*,
   259 NLRB 881 (1981), *enforced*,
   696 F.2d 1120 (5th Cir. 1983) ......................................................... 41

*Met. Ed. Co.*,
   330 NLRB 107 (1999) ............................................................. 51, 52

## TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                    **Page(s)**

*Metro. Edison Co. v. NLRB*,
    460 U.S. 693 (1983) ........................................................................ 18

*Midwest Div.—MMC, LLC v. NLRB*,
    867 F.3d 1288 (D.C. Cir. 2017) ............................................... 19, 43

*Minnesota Mining & Mfg. Co.*,
    261 NLRB 27 (1982), *enforced sub nom.*,
    *Oil Chem. & Atomic Workers*,
    711 F.2d 348 (D.C. Cir. 1983) .................................................. 51, 52

*Mission Foods*,
    345 NLRB 788 (2005) .............................................................. 45, 50

*Mondelez Global LLC,*
    5 F.4th 759 (7th Cir. 2021) ..................................................................50

*N. Indiana Publ. Serv. Co.*,
    347 NLRB 210 (2006) ........................................................................ 52

*N.Y. & Presbyterian Hosp. v. NLRB*,
    649 F.3d 723 (D.C. Cir. 2011) .......................................... 21, 24, 27

*Nexstar Broad., Inc. d/b/a KOIN-TV*,
    370 NLRB No. 68 (2021), 2021 NLRB LEXIS 12 ..........................19

*Nexstar Broad., Inc. d/b/a KOIN-TV*,
    367 NLRB No. 117 (2019), 2019 NLRB LEXIS 245 ......................49

*NLRB v. Acme Indus. Co.*,
    385 U.S. 432 (1967) ......................................................... 18, 19, 36

*NLRB v. Curtin Matheson Sci., Inc.*,
    494 U.S. 775 (1990) ........................................................................ 18

*NLRB v. Leonard B. Hebert, Jr. & Co.*,
    696 F.2d 1120 (5th Cir. 1983) ......................................................... 37

vi

# TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                 **Page(s)**

*Oil, Chem. & Atomic Workers Local Union No. 6-148 v. NLRB*,
 711 F.2d 348 (D.C. Cir. 1983) ....................................................... 26, 44, 49, 51

*Providence Hosp. v. NLRB*,
 93 F.3d 1012 (1st Cir. 1996) ................................................................. 45, 49, 50

*Publ. Serv. Co. of NM*,
 364 NLRB 1017 (2016) ................................................................................ 46, 50

*Resorts Int'l Hotel Casino v. NLRB*,
 996 F.2d 1553 (3d Cir. 1993) ............................................................................ 44

*Shamrock Foods Co. v. NLRB*,
 779 F. App'x. 752 (D.C. Cir. 2019) ................................................................. 18

*Shoppers Food Warehouse*,
 315 NLRB 258 (1994) ........................................................................................ 37

*Stericycle, Inc.*,
 370 NLRB No. 89 (2021), 2021 NLRB LEXIS 58.......................................... 39

*Teachers Coll., Columbia Univ. v. NLRB*,
 902 F.3d 296 (D.C. Cir. 2018) .............................................................. 21, 22, 36

*U.S. Testing Co. v. NLRB*,
 160 F.3d 14 (D.C. Cir. 1998) ....................................... 20, 21, 27, 34, 43, 44, 48

*UFCW, Local 204 v. NLRB*,
 506 F.3d 1078 (D.C. Cir. 2007) ........................................................................ 18

*United States Postal Service*,
 364 NLRB 230 (2016), *enforced*,
 No. 16-1313 (D.C. Cir. Jul. 17, 2017) ...................................... 44, 46, 48, 49, 50

*Universal Camera Corp. v. NLRB*,
 340 U.S. 474 (1951) ........................................................................................... 17

## TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                **Page(s)**

*Wyman Gordon Pa., LLC v. NLRB*,
   836 F. App'x 1 (D.C. Cir. 2020) ....................................................... 42

**Statutes**                                                            **Page(s)**

National Labor Relations Act, as amended
   (29 U.S.C. § 151 et seq.)

Section 8(a)(1) (29 U.S.C. § 158(a)(1))............................................ 2, 14, 15, 18, 19
Section 8(a)(5) (29 U.S.C. § 158(a)(5))............................................ 2, 14, 15, 18, 19
Section 10(a) (29 U.S.C. § 160(a)) ................................................................ 2
Section 10(e) (29 U.S.C. § 160(e)) .......................................................... 2, 18
Section 10(f) (29 U.S.C. § 160(f)) .............................................................. 2

**Rules**

Fed. R. App. P. 28(a)(8)(A) ................................................................... 25

## GLOSSARY

| | |
|---|---|
| Act | National Labor Relations Act (29 U.S.C §§ 151 *et seq.*) |
| AMR | American Medical Response of Connecticut, Inc. |
| Board | National Labor Relations Board |
| Br. | Opening brief of AMR to this Court |
| D&O | The Board's Decision and Order (371 NLRB No. 106) |
| EMTs | Emergency medical technicians |
| GCX | General Counsel exhibits in Board hearing |
| RX | Employer (AMR) exhibits in Board hearing |
| Tr. | Transcript of Board hearing |
| Union | International Association of EMTs & Paramedics Local R1-999, NAGE/SEIU Local 5000 |

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

### Nos. 22-1261 & 22-1283

————————————

## AMERICAN MEDICAL RESPONSE OF CONNECTICUT, INC.

**Petitioner/Cross-Respondent**

**v.**

## NATIONAL LABOR RELATIONS BOARD

**Respondent/Cross-Petitioner**

## ON PETITION FOR REVIEW AND CROSS-APPLICATION FOR ENFORCEMENT OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD

————————————————

## BRIEF FOR THE NATIONAL LABOR RELATIONS BOARD

————————————————

### STATEMENT OF JURISDICTION

This case is before the Court on the petition of American Medical Response of Connecticut, Inc. (AMR) to review, and the cross-application of the National Labor Relations Board to enforce, a Board Order (371 NLRB No. 106) issued

against AMR on June 10, 2022.  (D&O 1-15.)[1]  The Board had jurisdiction over

the proceedings below pursuant to Section 10(a) of the National Labor Relations

Act (the Act), 29 U.S.C. § 160(a).  The Court has jurisdiction over this appeal

pursuant to Section 10(e) and (f), 29 U.S.C. § 160(e) and (f).  The petition and

cross-application were timely as the Act places no time limit on such filings.

## ISSUE PRESENTED

Whether substantial evidence supports the Board's finding that AMR

violated Section 8(a)(5) and (1) of the Act by refusing to provide relevant,

requested information to the collective-bargaining representative of its employees.

## RELEVANT STATUTORY PROVISIONS

All relevant statutory provisions are contained in the addendum attached to

AMR's opening brief.

## STATEMENT OF THE CASE

The International Association of EMTs & Paramedics Local R1-999,

NAGE/SEIU Local 5000 (the Union) represents a unit of employees at AMR's

New Haven division.  Around April 2020, the Union became concerned that AMR

was violating the parties' contract by using non-unit employees from another

---

[1]  References preceding a semicolon are to the Board's findings; those following
are to the supporting evidence.  "Br." refers to AMR's opening brief.  Citations to
the original record are abbreviated as defined in the Glossary.

division to perform unit work, while cutting the hours of unit employees, and by

failing to follow contractual seniority procedures.  After discussing its concerns

with AMR, the Union requested several types of information to investigate and,

ultimately, to file and pursue grievances.  AMR refused to provide four categories

of requested information, despite the Union's repeated requests and despite the

information's plain relevance to the Union's representational duties.  The Board

found that AMR violated the Act by withholding that information.

## I.    THE BOARD'S FINDINGS OF FACT

### A.    Background:  AMR's Operations and the Parties' Collective-Bargaining Relationship

AMR provides emergency medical services throughout the United States,

including from divisions in New Haven and Bridgeport, Connecticut.  (D&O 6.)

The Union represents about 125 full-time and 300 part-time paramedics,

emergency medical technicians (EMTs), and HandiVan drivers employed at

AMR's New Haven facility.  Those in AMR's nearby Bridgeport division are

unrepresented.  (D&O 6 & n.6; Tr. 169-70; GCX 1(c).)  The parties' most recent

collective-bargaining agreement (Agreement) was effective from January 1, 2019,

through December 31, 2021.  (D&O 6; GCX 2.)

New Haven EMTs and paramedics select their work shifts through a

computerized scheduling system.  (D&O 7; Tr. 170-71.)  When a shift remains

unfilled, AMR will try to find an EMT or paramedic to work it, "hold over" a part-

time employee beyond his scheduled hours to cover part of the shift, or cancel the

shift.  (D&O 7; Tr. 340-42.)  A cancelled shift appears as "browned out" in the

scheduling system.  (D&O 7; Tr. 171, GCX 12(a)-(c).)

**B.    The Union Files a Grievance in Late 2019 Regarding AMR's Use of Non-Unit Employees To Perform New Haven-Unit Work**

Section 4.02 of the Agreement bars AMR from subcontracting unit work.

(D&O 6; GCX 2, p. 10.)  In late 2019, Union President Michael Montanaro

received reports of non-unit, Bridgeport employees handling emergency calls and

routine transports in the New Haven area.  (D&O 7; Tr. 175-77.)  In October, he

filed a grievance alleging that AMR was subcontracting unit work to its Bridgeport

division in violation of section 4.02.  (D&O 7; GCX 3, Tr. 175.)  The parties

resolved the grievance when AMR Regional Director Bill Schietinger, who

oversees the New Haven and Bridgeport divisions, agreed that AMR would not

schedule Bridgeport ambulances or crews to handle New Haven calls, absent a

situation triggering the two divisions' "mutual aid" agreement.[2]  (D&O 7 & n.9;

Tr. 47-50, 177-80.)

---

[2]  Such agreements between neighboring emergency-services providers, to assist
one another in times of emergency or unusual need, are common in the industry.
(D&O 7; Tr. 48-49, 178-79.)

5

**C.    AMR Invokes the Agreement's Disaster Provision During the COVID-19 Crisis**

In March 2020, AMR's parent company sent the Union's national director a letter regarding the COVID-19 crisis.  (D&O 7; RX 4.)  The letter notes that most of the collective-bargaining agreements covering its employees at various locations provide that, in the event of a disaster or catastrophe outside the employer's control, the employer would be temporarily relieved of specified contractual obligations.  The Agreement's disaster provision, section 23.03, specifies that it applies to "scheduled paid time off, job posting, shifts changes and transfers." (D&O 7 n.10; GCX 2, p. 45).  The letter identified the COVID-19 crisis as a qualifying disaster.  (D&O 7; RX 4, pp. 8-9.)

**D.    The Union Notices an Increase in Non-Unit Employees Performing Unit Work While Unit Employees Lose Hours**

Shortly thereafter, the subcontracting issue the parties had resolved in settling the Union's October 2019 grievance resurfaced.  In March and April, the New Haven division had experienced a drop in call volume which had caused AMR to decrease the number of shifts scheduled for New Haven unit employees. In early May, the call volume in New Haven began to increase.  (D&O 7; Tr. 193-94, 292.)  Meanwhile, Montanaro himself noticed—and received complaints from unit employees—that Bridgeport crews were increasingly handling calls and transports in the New Haven area.  (D&O 7; Tr. 179-80.)  He saw the readily

identifiable Bridgeport ambulances in the parking lots of New Haven hospitals.[3]

He also heard Bridgeport crews accepting New Haven calls over the radio. (D&O

7; Tr. 180-85.) At the same time, Montanaro and Nate Smith, the International

Union representative assigned to assist Montanaro, received complaints from

several part-time unit employees that their shifts were browned out or that they

were held over past the end of their shifts. (D&O 7; Tr. 186-88.)

### E.    The Union Requests Information and Files Subcontracting Grievances; AMR Refuses To Provide Four Categories of Information and Denies the Grievances

As described below in more detail, the Union raised its concerns to AMR.

When AMR's answers did not satisfy the Union, the Union requested specific

information to better understand the situation and evaluate the need to file

additional grievances. When the problems continued and AMR refused to provide

several types of requested information, the Union clarified portions of its request,

requested additional information, and filed additional grievances. AMR denied the

grievances and, with few exceptions, declined to provide requested information.

(D&O 1, 6-10.)

---

[3] AMR ambulances have distinct numbers stenciled on their sides, which vary by division: New Haven ambulances' numbers all start with a two or five, Bridgeport's start with a seven. (D&O 7 & n.8; Tr. 175, 289-90.)

### 1. The Union Repeatedly Raises Its Subcontracting and Seniority Concerns to AMR

On May 2, Montanaro first emailed Regional Director Schietinger regarding increasing brown outs in the New Haven schedule.  (D&O 7; GCX 7.)  Montanaro stated that, given the elimination of so many part-time hours from the New Haven schedule, shifts should be awarded based on seniority pursuant to section 9.03 of the Agreement, which requires AMR to go in the order of reverse seniority when it eliminates part-time hours.  (D&O 7; GCX 2, pp. 17-18, GCX 7.)  He also stated that AMR should add shifts to the New Haven schedule rather than holding employees past their shifts.  (D&O 7; GCX 7.)  Schietinger replied that AMR would add shifts based on increased demand as indicated by call volume.  (D&O 7-8; GCX 7.)

Two days later, Montanaro emailed Schietinger that he was "taken aback" by the surprisingly large number of unit shifts AMR had deleted from the schedule. Montanaro also said that he was hearing Bridgeport crews on the radio, signing in to handle New Haven calls.  He noted that those circumstances contradicted Schietinger's earlier representation that AMR would add shifts for New Haven employees.  Schietinger replied that AMR was adding New Haven shifts.  He also acknowledged assigning one Bridgeport crew to transport a patient to a New Haven hospital, attributing that non-unit assignment to a spike in call volume and

8

the fact that the crew was already in New Haven after transporting a different patient.  (D&O 8; GCX 8.)

During a meeting on about May 6, Montanaro asked Schietinger why AMR had cut 1000 hours from the New Haven schedule.  Schietinger replied that the reduction was due to COVID.  He also said AMR would do its best not to hold New Haven crews beyond their shifts or schedule Bridgeport crews to handle New Haven calls.  (D&O 8; Tr. 192-94.)

International representative Smith then followed up with Schietinger, calling to reiterate Montanaro's concerns.  Schietinger maintained that Bridgeport crews were only used in New Haven for mutual aid.  Smith also reiterated the Union's complaint about AMR's failure to follow seniority when scheduling or browning out shifts.  Schietinger confirmed that AMR was instead scheduling based on "unit hour utilization" rates, i.e., the amount of time an ambulance is in service rather than idle.  Before ending the call, Smith stated that he would request information to better assess AMR's claims.  (D&O 8; Tr. 63, 66.)

### 2.    The Union's May 7 Information Request

As promised, Smith emailed Schietinger on May 7 to request the following information, all "since March 1, 2020," in order to continue the Union's investigation into "concerns regarding the reduction of part-time membership, and the reduction of shifts":

1. A list of bargaining-unit members removed from the schedule;

2. A list of shifts removed from the schedule;

3. Call-volume data;

4. The number of calls non-unit crews responded to in the New Haven area;

5. An explanation of management's decision on which shifts to cut; and

6. Copies of the New Haven schedule.

(D&O 8; GCX 9.)

AMR did not respond. On May 18, Smith resent the request. (D&O 8; GCX 10.) That same day, Montanaro emailed Schietinger, asserting that New Haven crews were being sent home before call-volume spikes, leaving the division understaffed. Schietinger claimed that situation was due in part to shifts being left open when unit employees either did not sign up, or called off shifts they were scheduled to work. (D&O 8; RX 6.) The next day, Schietinger emailed Smith an apology for AMR's delay in responding to the Union's information request and stated that Aaron Nupp, the Labor Relations Manager for AMR's parent company, would respond. (D&O 8; GCX 11.)

Smith and Nupp subsequently discussed the May 7 information request. Nupp explained that he was determining how to provide the voluminous responsive scheduling information. Smith clarified that the Union would not insist on the entire schedule. He explained that in requesting a list of bargaining unit

members and shifts removed from the schedule, he primarily sought information regarding which shifts had been browned out from the New Haven schedule and which unit employees were affected by those brown outs. Nupp said he would supply that information and did not express any other concerns or confusion about the request. (D&O 8; Tr. 74, 76-77.)

On June 7, Nupp emailed AMR's response to the May 7 request. It provided the explanation of its decisions and copies of the schedule, as well as the list of browned-out shifts Smith had represented the Union would accept in lieu of a list of all eliminated shifts. AMR did not provide information in response to the Union's remaining requests. In withholding that information, AMR claimed:

1. The request for a list of employees removed from the schedule was overly broad. AMR would consider a request revised to indicate the specific reasons the employees had hours reduced. (D&O 8-9 & n.12; GCX 12.)

2. The request for call-volume data was overbroad, irrelevant, "proprietary in nature," and "outside the Union's jurisdiction and the collective-bargaining relationship." (D&O 9 & n.13; GCX 12; Tr. 255.)

3. The request for the number of New Haven calls handled by non-unit employees was "outside the union's jurisdiction and the collective-bargaining relationship," as was "any information" regarding non-unit employees. (D&O 9; GCX 12.)

On June 10, Smith responded to further clarify the May 7 information request. To explain the request for a list of unit employees removed from the schedule—which Smith had previously told Nupp sought information on

employees affected by brown outs—Smith specified that the Union was seeking the list AMR used, by seniority per Agreement section 9.03, of unit members impacted by brown outs.  As to the relevance of the call-volume data and the number of New Haven calls handled by non-unit employees, he explained that both were "relevant to the ongoing union investigation into non-bargaining unit AMR employees performing bargaining unit work in the New Haven coverage area on a frequent basis during continued brown outs."  (D&O 9; GCX 13.)  Having received no response, Smith resent the June 10 clarification on July 2.  (D&O 9; GCX 15.)

### 3.    The June 15 Information Request

Meanwhile, on June 15, the Union submitted a new request for information, explicitly linking the request to its ongoing investigation "into concerns over staffing levels and brown outs."  (D&O 9; GCX 14.)  Specifically, the Union sought documentation of:  (1) response-time requirements for emergency calls and (2) New Haven response times (the period between AMR receiving a call and the ambulance crew arriving on scene) from May 1 through June 15.  (D&O 9 & n.15; GCX 14, Tr. 317.)  AMR did not respond to the June 15 request.

### 4.    The July Grievances and Renewed Information Request

On July 8, the Union filed a grievance alleging that AMR was violating the Agreement's subcontracting provision, section 4.02, by using non-unit employees to cover increased call volume in the New Haven area while removing hours from

the New Haven schedule.  AMR denied the grievance at step 1, claiming it had not

violated the Agreement.  (D&O 9; GCX 16-17, Tr. 121, 209.)  On July 16, the

Union moved its grievance to step 2 and filed another, closely related, grievance.

(D&O 9-10; GCX 19.)  That same day, Smith emailed Nupp again to follow up on

the June 10 email clarifying the Union's May 7 information request.  (D&O 10;

GCX 18.)

### 5.    AMR Continues To Withhold Relevant,  Requested Information

As of July 16, AMR had not responded to the Union's June 10 clarification

of the May 7 information request nor to the June 15 information request and had

still not provided:  (1) a list of employees removed from the schedule/affected by

brown outs; (2) call-volume data; (3) the number of New Haven calls handled by

non-unit employees; or (4) response-time information.  On July 17, Nupp wrote to

explain why AMR would not do so.  (D&O 10; GCX 20.)

First, invoking the language in Smith's June 10 clarification of the May

information request, Nupp responded that AMR had no "seniority list for brown

outs."  (D&O 10; GCX 20.)  He also asserted that New Haven hour reductions

were based on AMR's needs and rights, pursuant to the Agreement's

"management's rights" clause, section 4.01, and "temporarily" free of contractual

constraints based on AMR's invocation of the Agreement's disaster provision.

(D&O 10; GCX 20; *see* D&O 6, GCX 2, p. 10, D&O 7, RX 4.)  Second, Nupp

reiterated AMR's prior objections to providing call-volume data and the number of

New Haven calls handled by non-unit crews.  Third, he asserted that AMR's right

to allocate resources under the management-rights clause and disaster provision

also justified its objection to providing data on calls handled by non-unit crews.

Finally, Nupp claimed that the June 15 requests for response-time documentation

were overbroad, irrelevant, and outside the bargaining relationship.  (D&O 10;

GCX 20.)

### 6.      The July 22 Information Request

On July 22, Smith sent an email again requesting the outstanding

information, this time for the express purpose of investigating the Union's active

subcontracting grievance.  (D&O 10; GCX 21.)  Article 16.08 of the Agreement

requires that each party "produce non-privileged and nonconfidential information

relevant to a particular grievance in response to a written request for such

information."  (D&O 10; GCX 2, p. 36.)  Echoing the Union's prior information

requests, the July 22 email sought:  (1) a list of employees affected by the "brown

out[s]" (D&O 10; Tr. 149); (2) New Haven call-volume data; (3) the number of

New Haven calls handled by non-unit employees; (4) AMR New Haven's

response-time policy; and (5) a detailed log of New Haven response times.  (D&O

10; GCX 21.)

In late July, after denying the Union's grievance at step 2 (D&O 10; GCX 22), AMR responded to the July 22 information request by refusing to provide additional information. Nupp asserted that the request for a list of employees affected by brown outs was overbroad and subjective and stated that AMR had no response-time policy. Regarding call-volume data, the number of calls handled by non-unit employees, and New Haven response times, Nupp referred the Union to AMR's previous responses. (D&O 10-11; GCX 24.)

On July 31, the Union submitted its July 8 grievance to arbitration. (D&O 11; GCX 25.) AMR provided no further response to the Union's information requests.

## II.    PROCEDURAL HISTORY

After AMR's final refusal to provide the outstanding requested information, the Union filed unfair-labor-practice charges, and the General Counsel issued a complaint alleging that AMR's refusal violated Section 8(a)(5) and (1) of the Act, 29 U.S.C. § 158(a)(5) and (1). (D&O 5.) After a hearing, an administrative law judge found that AMR had violated the Act as alleged with respect to most of the outstanding information requests. (D&O 11-14.) AMR filed exceptions.[4] (D&O 1.)

---

[4] There were no exceptions to the judge's dismissal of the allegation that AMR unlawfully failed to provide a response-time policy. (D&O 1 n.2, 13.)

### III.    THE BOARD'S CONCLUSIONS AND ORDER

The Board (Chairman McFerran and Members Ring and Wilcox) found, in agreement with the judge, that AMR violated Section 8(a)(5) and (1) of the Act by refusing to provide certain requested information relevant to the Union's representational duties, namely:  (1) a list of bargaining-unit members removed from the work schedule or affected by brown outs since March 1, 2020;[5] (2) data showing New Haven call volume since March 1; (3) the number of New Haven calls handled by non-unit members since March 1; and (4) documentation detailing New Haven response times from May 1 through June 15.  (D&O 1-3 & nn.1-6, 13-14.)

As a remedy, the Board ordered AMR to cease and desist from the violations found.  (D&O 1, 3, 14.)  The Board (Member Ring, dissenting in part) also ordered AMR to provide the Union with the relevant, requested information.[6]  (D&O 3-4 & n.6, 14.)  Finally, the Order requires AMR to post a remedial notice.  (D&O 4, 14.)

Thereafter, AMR filed a motion for reconsideration with the Board.  (*See* July 29, 2022 Motion.)  The Board denied the motion because AMR had not

---

[5]  As to the requested lists of unit employees removed from the schedule or affected by brown outs, the Board clarified that AMR "need not produce information in response to one request that is duplicative of information [AMR] will provide in response to the other request."  (D&O 3-4 n.6.)

[6]  Member Ring would have ordered the parties to engage in accommodative bargaining regarding the requested call-volume data in light of AMR's assertion that the information is proprietary.  (D&O 3-4 nn.5-6.)

identified any material error or demonstrated extraordinary circumstances warranting reconsideration.  (October 6, 2022 Order at 1.)

## SUMMARY OF ARGUMENT

Substantial evidence supports the Board's finding that AMR violated the Act by refusing to provide four categories of requested information.  All of the information was relevant to the Union's concerns regarding possible subcontracting- and seniority-related contract violations and eventual pursuit of grievances regarding AMR's reduction of New Haven unit employees' hours and use of non-unit employees to perform unit work.  One category of information, regarding employees who lost hours due to shift cancellations, concerns unit-employee hours and is therefore presumptively relevant.  And the Union's requests and correspondence made clear to AMR that all four categories of requested information were sought for—and relevant to—the Union's investigation and filing of grievances.  It is beyond dispute that the Union is entitled to receive information that is of probable relevance to pursuing grievances.

AMR's refusal to provide the relevant, requested information was unlawful because it failed to establish any defense.  AMR does not dispute the presumptive relevance of the unit-employee information and fails to undermine the Board's relevance findings regarding the rest of the information.  AMR's challenges to the merits of the Union's underlying grievances are inapposite because, under settled

law, the Board does not pass on the merits of a grievance in assessing the relevance of requested information.

Finally, the Board acted well within its broad remedial discretion in declining to order bargaining to accommodate AMR's purported proprietary interest in the relevant, requested call-volume data. Substantial evidence supports the Board's finding that AMR failed to establish or preserve such a defense. And settled law supports ordering production of relevant information in those circumstances.

## STANDARD OF REVIEW

The Court accords adjudications by the Board "a very high degree of deference." *Bally's Park Place, Inc. v. NLRB*, 646 F.3d 929, 935 (D.C. Cir. 2011). It will "abide [the Board's] interpretation of the Act if it is reasonable and consistent with controlling precedent." *Enter. Leasing Co. v. NLRB,* 831 F.3d 534, 543 (D.C. Cir. 2016) (citation omitted); *accord Holly Farms Corp. v. NLRB*, 517 U.S. 392, 398-99 (1996). And the Board's findings of fact are "conclusive" when supported by substantial evidence. 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951); *Enter. Leasing Co.,* 831 F.3d at 542. Evidence is substantial when "a reasonable mind might accept [it] as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). And a reviewing court may not displace the Board's choice between two fairly conflicting

18

views, even if the court "would justifiably have made a different choice had the

matter been before it *de novo*." *Id.* at 488. *Accord Shamrock Foods Co. v. NLRB*,

779 F. App'x. 752, 756 (D.C. Cir. 2019); *UFCW, Local 204 v. NLRB*, 506 F.3d

1078, 1080 (D.C. Cir. 2007).

## ARGUMENT

**Substantial Evidence Supports the Board's Finding that AMR Violated
Section 8(a)(5) and (1) of the Act by Refusing To Furnish Requested
Information Relevant to the Union's Representational Duties**

Section 8(a)(5) of the Act makes it an unfair labor practice for an employer

"to refuse to bargain collectively with the representatives of his employees." 29

U.S.C. § 158(a)(5). A violation of Section 8(a)(5) results in a derivative violation

of Section 8(a)(1) by interfering with employees' collective-bargaining rights. *See,*

*e.g., NLRB v. Curtin Matheson Sci., Inc.*, 494 U.S. 775, 778 (1990); *Metro. Edison*

*Co. v. NLRB*, 460 U.S. 693, 698 n.4 (1983).

An employer's duty to bargain includes the obligation "to provide

information that is needed by the bargaining representative for the proper

performance of its duties." *NLRB v. Acme Indus. Co.*, 385 U.S. 432, 435-37

(1967); *Brewers & Maltsters, Local Union No. 6 v. NLRB*, 414 F.3d 36, 45 (D.C.

Cir. 2005). To trigger that obligation, a union must show that the requested

information is relevant to its representational duties, which include the

investigation, filing, and pursuit of grievances under the parties' collective-

bargaining agreement.  *DaimlerChrysler Corp. v. NLRB*, 288 F.3d 434, 443 (D.C.

Cir. 2002) (citing *Acme Indus.*, 385 U.S. at 437-38); *Disneyland Park*, 350 NLRB

1256, 1258 (2007).  Once the union has established relevance, the burden shifts to

the employer to show that the requested information is not in fact relevant or does

not exist, or to prove that it has a legitimate and substantial interest, such as

confidentiality, that prevents it from providing the information.  *Nexstar Broad.,

Inc. d/b/a KOIN-TV*, 370 NLRB No. 68, slip op. at 10, 2021 NLRB LEXIS 12, at

**45 (2021).  Absent a defense to production, an employer's failure to provide the

relevant, requested information in a timely manner violates Section 8(a)(5) and (1)

of the Act.  *Acme*, 385 U.S. at 435-36; *Midwest Div.—MMC, LLC v. NLRB*, 867

F.3d 1288, 1293, 1299 (D.C. Cir. 2017); *Brewers & Maltsters*, 414 F.3d at 45-46.

In this case, the Union requested, and AMR refused to provide, the

following information:

(1) A list of unit employees removed from the work schedule, or affected by
brown outs, since March 1, 2020;

(2) New Haven call-volume data since March 1;

(3) The number of New Haven calls handled by non-unit employees since
March 1; and

(4) New Haven response times from May 1 through June 15.

The Board found that each of the above categories of requested information was

relevant to the Union's representational duties, specifically the investigation and

filing of grievances, and that AMR established no defense to providing the information.  Accordingly, the Board found AMR unlawfully withheld that information and ordered AMR to provide it to the Union in full.  As shown below, the Board's findings are supported by substantial evidence and settled law, while AMR's challenges lack merit.

## A.    All of the Requested Information Was Relevant

Information concerning bargaining-unit employees' terms and conditions of employment is presumptively relevant to the Union's role as bargaining representative, including employees' names, hours, and shifts.  *DaimlerChrysler Corp. v. NLRB*, 288 F.3d 434, 443 (D.C. Cir. 2002); *Country Ford Trucks, Inc. v. NLRB*, 229 F.3d 1184, 1191 (D.C. Cir. 2000); *U.S. Testing Co., Inc. v. NLRB*, 160 F.3d 14, 19 (D.C. Cir. 1998).  Where the requested information is presumptively relevant, "no further explanation [i]s required" to trigger the employer's duty to provide it.  *Country Ford Trucks, Inc.*, 229 F.3d at 1191-92.  As this Court has noted, "the rationale underlying the presumptive relevance rule" is to avoid "potentially endless bickering . . . over the specific relevance of information, the very nature of which ought to render its relevance obvious."  *Id.* (citation and internal quotation marks omitted).

If requested information is not presumptively relevant, it is subject to a liberal "discovery-type standard" of relevance.  *DaimlerChrysler Corp.*, 288 F.3d

at 443.  That standard is not demanding:  "a union need not demonstrate that the

information is certainly relevant or clearly dispositive of the basic issues between

the parties.  The fact that the information is of probable or potential relevance is

sufficient to give rise to an obligation to provide it." *Oil, Chem. & Atomic*

*Workers Local Union No. 6-148 v. NLRB*, 711 F.2d 348, 359 (D.C. Cir. 1983)

(quotations and ellipses omitted); *accord Teachers Coll., Columbia Univ. v. NLRB*,

902 F.3d 296, 302 (D.C. Cir. 2018).  A union satisfies this "low" threshold for

relevance, *Teachers Coll.*, 902 F.3d at 302, when it has a reasonable belief,

supported by objective evidence, that the requested information is relevant.

*Disneyland Park*, 350 NLRB 1256, 1258 (2007).

The Union usually must also provide the employer with a non-conclusory

explanation of requested information's relevance.  *Disneyland*, 350 NLRB at 1258

& n.5; *N.Y. & Presbyterian Hosp. v. NLRB*, 649 F.3d 723, 730 (D.C. Cir. 2011).

However, even absent such an explanation, an employer must provide requested

information if its relevance "should have been apparent to [the employer] under the

circumstances."  *Disneyland*, 350 NLRB at 1258; *see Crozer-Chester Med. Ctr. v.*

*NLRB*, 976 F.3d 276, 288 (3d Cir. 2020) (where circumstances make relevance

"readily apparent," a communication of facts underlying the request may be

unnecessary); *accord N.Y. & Presbyterian Hosp.*, 649 F.3d at 730-31; *U.S. Testing,*

160 F.3d at 19-20.

The Board's relevance findings are entitled to considerable deference.  Thus, whether information is relevant "is, in the first instance, a matter for the NLRB, and the Board's conclusions are given great weight by the courts." *Oil, Chem. & Atomic Workers*, 711 F.2d at 360; *accord Teachers Coll.*, 902 F.3d at 302.

Here, as the Board found (D&O 11-12), the background circumstances, as well as the Union's written and oral communications, established—and made it readily apparent to AMR—that the Union sought all four categories of requested information to investigate and pursue grievances over potential violations of the Agreement.  Specifically, AMR knew or should have known that:  (1) the Union was investigating whether AMR was violating the Agreement (by reducing unit hours while increasing its use of non-unit crews to handle unit work and by failing to follow the seniority process for reducing hours), in preparation for the grievances it ultimately filed, and (2) the Union made its May-July information requests in service of that investigation.

Even before its first request, the Union apprised AMR of those subcontracting- and seniority-related concerns and of its plan to request information to investigate them.  In early May 2020, two union representatives told AMR several times that the Union was concerned by AMR's "browning out" or reducing the hours of unit employees while using non-unit crews to perform unit work.  The Union also inquired whether AMR was following the Agreement's

seniority provision when reducing employees' hours.  Finally, the Union explicitly

told AMR it would request information relating to those concerns.  (D&O 8-9, 11-

12.)  Over the next two months, the Union did so—and continued to communicate

and clarify its concerns.

Thus, on May 7, the Union's first information request expressly cited

AMR's "reduction of part-time membership, and the reduction of shifts."  (D&O 8,

12; GCX 9.)  And, on June 10, the Union spelled out that it needed the information

for its ongoing "investigation into non-bargaining unit employees performing

bargaining unit work in the New Haven area on a frequent basis during continued

brown outs."  (D&O 9, 12; GCX 13.)  It also linked its request for unit-employee

information to the Agreement's seniority provision.  And the June 15 request cited

an investigation into staffing levels and brown outs to explain the need for

response-time information.  This series of requests and explanations culminated

with the Union filing subcontracting grievances in July, promptly followed by a

final information request explicitly tying the outstanding requested information to

grievance processing.  (D&O 9-10, 12.)

Given the Union's oral and written communications and requests, not to

mention AMR's responses, AMR cannot plausibly claim (Br. 35-37, 40-41, 46-52)

that it did not understand the Union's subcontracting- and seniority-related

concerns or realize that the information requests were intended to further the

Union's investigation into potential and actual grievances.  As demonstrated below, those same communications and circumstances prove that the Union reasonably believed, and AMR should have understood, that each category of information was of probable relevance to assessing and prosecuting the grievances.

1.  **Unit employees removed from the schedule or affected by brown outs**

    a.  **AMR does not dispute that the requested information regarding unit employees is presumptively relevant**

The Board found that the first category of requested information—a list of unit employees removed from the work schedule or affected by brown outs—was presumptively relevant because it directly relates to the unit employees' hours of work.  (D&O 12.)  *See DaimlerChrysler Corp.*, 288 F.3d at 443; *see, e.g., Columbia College Chicago*, 360 NLRB 1116, 1126-27 (2014) (requested list of unit teachers who had class assignments reduced was presumptively relevant).  In its brief, AMR does not contest—and has therefore waived the right to challenge— this finding.  *See N.Y. Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (D.C. Cir. 2007) (claims not made in opening brief are deemed waived) (citing Fed. R. App. P. 28(a)(9)) (presently Rule 28(a)(8)(A)); *accord Dunkin' Donuts Mid-Atlantic Distrib. Ctr., Inc. v. NLRB*, 363 F.3d 437, 441 (D.C. Cir. 2004).  Because the unit-employee information is presumptively relevant, the Union had no additional burden to demonstrate relevance.  Therefore, AMR's arguments

(Br. 32-36) regarding the clarity of the Union's explanations for requesting the information, or of the information's relevance, are inapposite. *See Country Ford Trucks, Inc.*, 229 F.3d at 1191-92 ("Because the information requested was 'presumptively relevant' for bargaining purposes, no further explanation was required.")

### b.   In any event, the Union established the relevance of the unit-employee information

Even putting the presumption of relevance aside, the Board reasonably found (D&O 12) that the Union established the relevance of the employee lists. There can be no serious argument that the lists of employees removed from the schedule, or affected by brown outs, have no probable relevance to assessing key elements of the Union's potential grievances, i.e., whether unit employees were losing work, and whether their hours were being reduced without regard to seniority.  Notably, AMR does not squarely dispute that relevance in its brief (thus waiving any such challenge).[7]

AMR seeks to excuse its failure to provide relevant, requested unit-employee information by implausibly claiming it did not understand the Union's requests, which AMR characterizes as "vague" and "overbroad."  (Br. 35-37.)  It

---

[7]  AMR does argue (Br. 37-39) that the employee lists are not relevant because the Union's grievances purportedly have no merit, a contention that fails for the reasons explained below (pp. 37-41).

also claims that the Union made a series of distinct requests for the information and that its response to each one was adequate.  (Br. 32-36.)  There is no merit to those arguments.

Fundamentally, AMR's argument is legally inapposite.  Because the unit-employee lists are *presumptively* relevant, overbreadth is not a pertinent consideration.  *See Country Ford Trucks*, 229 F.3d at 1192 (even if union's "request was overbroad, this does not excuse the [employer] from providing the requested information to which the Union had an undisputed right").  Moreover, a request's overbreadth or vagueness does not excuse an employer's failure to furnish any information.  Rather, as the Board noted, the employer must still provide relevant, responsive information or, if the request is unclear, seek clarification.  *See* D&O 2 n.4 (citing cases); *see also Oil Chem. & Atomic Workers*, 711 F.3d at 361 (mere fact that union's request encompasses "information which the employer is not legally obligated to provide does not automatically excuse him from complying with the Union's request to the extent that it also encompasses information which he would be required to provide if it were the sole subject of the demand"); *Columbia College Chicago*, 360 NLRB at 1127 (employer presented with vague request is not entitled to ignore it or delay its response, but must "seek prompt clarification").  If the Union's request was overbroad, AMR was, at a minimum, obliged—but failed—to provide a list of unit employees who were

removed from the schedule and lost hours due to brownouts, and to seek

clarification on whether the request also covered additional information.  AMR did

not do either.

In any event, AMR's claim that the requests for unit-employee information

were excessive or unclear—and that its responses were adequate—is factually

incorrect whether the requests are considered individually or collectively.  AMR

claims that the Union's use of varying terminology when it requested the two

lists—of employees "removed" from the schedule (May 7) and "affected" (July 22)

by brown outs—made the requests unclear.  (Br. 33-37.)  Not so.  As shown below,

that argument wrongly depends on analyzing only "the face of the requests"

(Br. 35), isolated from the parties' other communications.  However, as this Court

has noted, "context is everything" in assessing an information request.  *U.S.

Testing*, 160 F.3d at 19.  *See N.Y. & Presbyterian Hosp.*, 649 F.3d at 731 (rejecting

claim that the "precise wording of the grievance bounded the scope of the

[employer's] duty to provide information," because relevance is also determined

by context).[8]

---

[8]  AMR asserts that the Board "implicitly" adopted AMR's premise that the
requests "were separate and distinct."  (Br. 33.)  Rather, the Board analyzed them
as one request but required AMR to provide both lists, i.e., of employees
"removed" from the schedule and of employees "affected" by brown outs.
(D&O 3-4 n.6, 12, 14.)  The Board also observed that the Union had acknowledged
that the requests "sought essentially the same information" (D&O 3-4 n.6; Tr. 149)
and, as explained (pp. 22-24), that similarity was evident from the requests and

In the context of the parties' communications, there was no confusion regarding the use of the term "affected" in the July information request, as the Board explicitly found (D&O 12).  To review (*see* pp. 8-9), the Union requested lists of both shifts and unit employees "removed" from the schedule on May 7 to investigate the concerns it had raised with AMR, which ultimately resulted in a grievance.  When Nupp asked for clarification, Smith explained that the Union sought a list of shifts that had been browned out and a corresponding list of unit employees "affected" by those brown outs, thereby linking employees losing work due to removal from the schedule with employees "affected" by brown outs.  Nupp expressed no confusion as to Smith's oral clarification and AMR narrowed its response to the request for shift information accordingly.  But it responded that the employee-list request was overbroad and that the Union should clarify the reason for removal.  That request for clarification was disingenuous given that Smith had provided that precise clarification in response to Nupp's inquiry just days before: the Union wanted to know about removal due to brown outs.  (D&O 7-8, 12; *see* pp. 9-11.)

---

other communications.  Moreover, the Board clarified that AMR need not produce duplicative information.  (D&O 3-4 n.6.)  That clarification, and AMR's inadequate responses to the requests, render irrelevant AMR's contention about purportedly separate requests.

It is of no moment whether, as AMR claims (Br. 34), the Union

acknowledged that "removed" could, in a vacuum, be interpreted more broadly

than the Union intended, and had specified to AMR.  The parties' May

communications made explicit—and certainly apparent to AMR—that the Union

sought lists of unit employees who had lost work hours due to brown outs in order

to investigate potential contractual violations.  But to the extent there could have

been any doubt that "affected" by brown outs referred to lost hours/removal from

the schedule, the Union's June 10 letter resolved it.  It clarified that the May 7

request for employees "removed" from the schedule sought a list of employees

"impacted"—a synonym of "affected"—by brown outs.

The June 10 letter also asked for the employee information in the form of the

seniority list AMR used for the impacted employees and explicitly invoked the

Agreement's seniority provision, further indicating that the Union was interested

specifically in lost hours, not in any or all possible effects of brown outs on

employees, as AMR speculates (Br. 36-37).  By its terms, the cited seniority

provision only applies when AMR *reduces the hours* of part-time unit employees.

(D&O 7; GCX 2, pp. 17-18.)  Accordingly, AMR strains credulity in claiming (Br.

34-35) that the June 10 letter—which was expressly sent to "clarify" the May 7

request—actually "abandoned" that request in favor of seeking "entirely different

information," namely, the seniority list.[9]  Moreover, even if the June 10 letter

could be understood to have dropped the request for unit employees removed from

the schedule, the July 22 request for those affected by brown outs would have

clearly renewed the request.  As shown, that July request was aimed at identifying

unit employees who lost hours due to brown outs, and the Union reinforced that

meaning by linking the request to its formal subcontracting grievance.  (D&O 12.)

Viewed in that context, the Union did not "change[] its request yet again" in its

July 22 request for information, much less to one "markedly different" from the

initial, May 7 request.  (Br. 36.)

In sum, the requested information regarding unit employees is presumptively

relevant.  Substantial evidence also supports finding it was established as relevant,

and that its relevance was apparent in context.  Once AMR's veil of feigned

confusion is lifted, it is left with no legitimate grounds for failing to provide the

unit-employee information.

## 2.    New Haven call-volume data

Substantial evidence also supports the Board's finding that the requested

---

[9]  AMR also insists that "no such [seniority] list exists."  (Br. 35 & n.8.)  But that is
beside the point.  The Union did not pursue a seniority list after AMR claimed not
to have one, and the Board did not order AMR to provide one.  Rather, the Board
ordered AMR to provide lists of unit employees removed/affected by brown outs.
AMR does not claim, and never has claimed, that those lists do not exist.

call-volume data was "demonstrably relevant" to the Union's investigation of contract violations and to its grievances. (D&O 12.) AMR itself put the call-volume data at issue in early May when Union President Montanaro first raised concerns over AMR browning out shifts and assigning New Haven-unit work to non-unit employees. (D&O 12.) In response, AMR Regional Director Schietinger said scheduling was dependent on call volume and, a few days later, admitted that he had assigned a Bridgeport crew to handle a New Haven call, blaming a spike in call volume. (D&O 12.) In other words, AMR twice explicitly linked call volume to the Union's expressed concerns.[10]

Unsurprisingly, when the Union made a request for information to investigate its subcontracting concerns a few days later, it included call-volume data. To the extent that data's relevance could have been unclear, the Union's June 10 email explicitly linked the request to the Union's investigation into subcontracting of unit work, and the July 22 request cited the Union's subcontracting grievance. (D&O 12 & n.20.) Thus, there is no merit to AMR's myopic claim that the Union "never expressed this explanation of relevance." (Br. 40.) And given that the Board's relevance analysis (D&O 12) relied on the

---

[10] AMR does not address (Br. 40-41)—and has therefore waived the right to challenge—the Board's finding that AMR's own statements put the relevance of the call-volume data at issue.

parties' own words, there is no basis for AMR's claim (Br. 40-41) that the Board substituted its own explanation of relevance for the Union's.

Finally, in light of the above and contrary to AMR (Br. 40 & n.10), the geographic scope of the Union's call-volume request (the New Haven area) was clear from the start. And as AMR concedes (Br. 40 n.10), any arguable confusion as to whether the Union sought call-volume data beyond the New Haven area was resolved by the July 22 request. Moreover, as explained above (pp. 26-27), overbreadth would not excuse AMR's ongoing failure to provide any relevant responsive information, i.e., New Haven call-volume data.[11]

### 3.    Unit work performed by non-unit employees

As the Board found (D&O 12), information about the number of New Haven calls handled by non-unit crews was also manifestly relevant to the Union's representational duties. Indeed, it is hard to imagine a type of information that would be more helpful to "the ongoing union investigation into non-bargaining unit AMR employees performing bargaining unit work . . . on a frequent basis during continued brown outs," which was the exact explanation the Union gave in its June 10 clarification. (D&O 9; GCX 13.) Not to mention that in conversations before the Union's May information request, the Union had complained to

---

[11]  As shown below (pp. 42-54), there is no merit to AMR's defense (Br. 41-45) that the call-volume data is confidential and therefore shielded from production.

Schietinger about non-unit crews working in New Haven and he had admitted that

had happened. (D&O 7-8, 12.) AMR's observation (Br. 47), that the Union also

raised other concerns, such as the removal of unit employees' shifts, is neither

surprising nor problematic. A union can have and investigate multiple concerns

simultaneously and information need not be relevant to every union inquiry to

trigger the employer's duty to produce it. Accordingly, the relevance of the

information to the Union's "concerns" was hardly the enigma AMR portrays it to

be (Br. 46-47), even before the June clarification.[12]

### 4.    New Haven response times

As the Board found (D&O 12), the details of the parties' communications

from May through July regarding the Union's subcontracting concerns—not to

mention common sense—also establish that requested New Haven response-time

data had the potential to aid the Union's investigations, particularly in conjunction

with the other information the Union requested. That potential is sufficient to meet

the discovery-like standard for establishing relevance.

As AMR well knew from the Union's various communications, the Union

was concerned that unit employees were losing hours because AMR was either

---

[12] As shown below (p. 40), there is no merit to the claim (Br. 47-48) that AMR's
failure to disclose this relevant information is excused by its purported practice of
assigning non-unit employees to perform unit work for "mutual aid" purposes.

inadequately staffing the New Haven division or browning out too many New Haven shifts.  And the Union was particularly concerned that AMR was doing so while simultaneously scheduling non-unit crews in New Haven or assigning non-unit crews to New Haven calls for more than "mutual aid."  It is disingenuous for AMR to feign ignorance as to how response-time data—particularly combined with requested call-volume data and information about unit employees' lost hours, browned-out shifts, and non-unit crews answering calls—would help the Union investigate its concerns.  Common sense dictates that an emergency-response company with fewer crews scheduled, or using crews from outside the covered area, would have longer response times.  And how those response times vary—or not—with variations in call volume or numbers of cancelled shifts could give a clearer picture of how the company was juggling staffing, scheduling, and call volume.  AMR itself was in the best position to understand the interplay of those factors.  It did not need a more detailed explanation from the Union, nor is the Union required to provide one when that interplay, and thus the response times' relevance, was evident under the circumstances.  *See U.S. Testing*; *Disneyland*, *supra* p. 22 (detailed explanation unnecessary where relevance is apparent from circumstances).  It is thus inaccurate and misguided for AMR to claim that "the Union never explained the relevance of its request" to AMR (Br. 49) and that the Board relied on relevance grounds never articulated by the Union (Br. 50-51).

In addition to logic, both parties' testimony at the administrative hearing suggests that they understood the potential relevance of response times to the disputed issues between them, including New Haven staffing levels and non-unit crews performing unit work.  Schietinger acknowledged that response times influence his staffing decisions.  (Tr. 329.)  It stands to reason that the converse may also be true:  that his staffing decisions influence response times.  Information about one could thus illuminate the other.  Smith, for his part, pointed to a matter of simple math:  the closer you are to your destination the sooner you typically arrive.  Therefore, barring understaffing in New Haven or scheduling of non-unit crews to work there, he would expect unit crews to respond to New Haven calls more quickly than non-unit crews from Bridgeport (an expectation Schietinger shared, Tr. 323-24).[13]  (D&O 12; Tr. 160-61.)

In sum, as the Board found, response times were manifestly relevant because they could potentially help the Union determine if AMR was staffing adequate unit crews to quickly respond to all New Haven calls or relying on non-unit crews to come in from outside—or even scheduling non-unit crews for New Haven shifts.

---

[13] Contrary to AMR (Br. 49), Smith did not admit that he never explained the relevance of the response times.  Rather, as the Board noted (D&O 1 n.4; Tr. 143-44), Smith testified that he did not personally explain the relevance *after* July 17, 2020, which has no bearing on the Union's prior showing of relevance.  Moreover, as shown, the July 22 information request explicitly cited the Union's pending grievance.  (D&O 1 n.4; GCX 21.)

(D&O 12.)  Once again, and contrary to AMR (Br. 50), it is not problematic that the Union proffered multiple, plausible theories for how response-time information is potentially relevant, nor, under the applicable relevancy standard, must it be "clear" that the requested data will "actually prove" any particular theory (Br. 52 n.13).  Moreover, as the above discussion demonstrates, the Union's various cited concerns (staffing levels, brown outs, non-unit employees performing unit work) are not as distinct as AMR suggests.

## B.    AMR Cannot Justify Withholding Relevant Information by Arguing the Merits of the Union's Grievances

As shown, all four types of requested information were relevant to the Union's prospective and actual grievances.  AMR's refusal to provide the information was thus unlawful unless it established a defense.  In addition to disputing the Union's relevance showings, AMR raises two challenges to the merits of the Union's underlying grievances.  The Board reasonably rejected those defenses based on settled law and substantial evidence in the record.

As this Court has explained, it is established that when assessing the relevance of information requested for investigating or processing a grievance, the Board "does not pass" on arguments about "the merits of the union's grievance." *Teachers Coll.*, *Columbia Univ. v. NLRB*, 902 F.3d 296, 306 (2018) (noting the "discovery-type standard" for assessing relevance "decide[s] nothing about the merits of the union's contractual claims") (quoting *Acme*, 385 U.S. at 437 & n.6).

*Accord NLRB v. Leonard B. Hebert, Jr. & Co.*, 696 F.2d 1120, 1125 (5th Cir.

1983); *Shoppers Food Warehouse*, 315 NLRB 258, 260 (1994).  Rather, under the

relevancy standard, "[i]t is sufficient that the information sought is relevant to

possible violations" and "[a]ctual violations need not be established."  *Leonard B.*

*Hebert*, 696 F.2d at 1125 (citation omitted).  *Accord Shoppers Food Warehouse*,

315 NLRB at 260 (under the applicable "broad, discovery-type standard," the

Board "does not pass on the merits of a union's claim of breach of a collective-

bargaining agreement in determining whether information relating to the

processing of a grievance is relevant") (collecting cases).

     Ignoring that settled law, AMR argues the merits of the Union's contractual

grievances when it claims that its invocation of the Agreement's disaster provision,

section 23.03, absolves it of any duty to provide two categories of requested

information:  (1) lists of employees removed from the schedule or affected by

brownouts (Br. 37-39), and (2) the number of non-unit employees performing unit

work (Br. 48 n.12).[14]  AMR contends that because the disaster provision

purportedly frees it of any obligation regarding "scheduled paid time off, job

posting, shift changes, and transfers" (D&O 7 n.10; GCX 2, p. 45), it has no

---

[14]  All four categories of requested information are relevant because they have the
potential to aid the Union's investigation.  It is unclear why AMR asserts this
defense only with respect to two categories of information—and did not assert it
with respect to information it provided, such as the list of browned-out shifts.

obligation to provide information related to those subjects—either because the Union directly waived its right to such information (Br. 37-39, 48 n.12) or because the Union waived its right to grieve (and thus request grievance-related information on) those subjects (Br. 39, 48 n.12).  However, as the law dictates, the Board properly declined to assess the merits of the Union's grievances in the face of AMR's disaster-provision defense when evaluating the information requests. (D&O 1 n.4, 12-13.)

AMR asserts that its waiver defense does not involve any interpretation of contractual language because the disaster provision is plain "on its face" and the Board needed only determine whether it "served" to restrict the Union's right to information.  (Br. 37-38.)  But that is just another way of arguing that its own interpretation is the correct one, as the Board recognized when it declined "to evaluate the merits of [AMR's] contractual waiver arguments."  (D&O 12.)  As the Board observed, resolving the waiver question would entail assessing, for example, the effect of section 16.08 of the Agreement, which explicitly requires AMR to produce non-privileged/confidential information relevant to a grievance.  (D&O 13.)  It is, moreover, far from obvious that a provision intended to allow AMR temporary operational leeway during a disaster would necessarily extend to

broadly extinguishing the Union's statutory right to information to fulfill its

representational duties.[15]

That the information in this case was requested in service of potential and

actual grievances further undercuts AMR's waiver argument, because it materially

distinguishes the one case AMR cites (Br. 39) in support, *ADT, LLC*, 369 NLRB

No. 31, 2020 NLRB LEXIS 86 (2020), *vacated and remanded on other grounds*

*sub nom. IBEW v. NLRB*, 9 F.4th 63 (2d Cir. 2021).  As the Board explained (D&O

12-13), *ADT* held—addressing an issue not presented here—that a contractual

waiver *of the right to bargain* over a particular term of employment may waive a

right to information that is requested *solely* for the purpose of bargaining over that

term.  *See* 369 NLRB No. 31, slip op. at 1, 2020 NLRB LEXIS 86, at **2.

However, the Board has held that a union's right to receive information is not

waived where, as here, it is sought for another representational purpose, such as

investigating a grievance.  *Stericycle, Inc.*, 370 NLRB No. 89, slip op. at 1 n.5,

---

[15]  Although the Board, appropriately, did not delve further into the merits of the
grievances by interpreting the disaster provision, the provision's scope and effect
are not, as AMR contends (Br. 37-39), facially indisputable.  Perhaps that is why
AMR itself resorts to extrinsic evidence to bolster its interpretation, citing its own
letter invoking and construing the provision and the Union's purported lack of
objection.  (Br. 38.)  Certainly, the Union's grievance arguing that AMR violated
the Agreement's subcontracting provision by reducing unit employees' hours while
covering calls with non-unit crews suggests that the Union does not believe the
disaster provision's temporary license—which is specific to leave, job postings,
shift changes, and transfers—covers subcontracting.

2021 NLRB LEXIS 58, at **2 n.5 (2021) (union waiver of right to bargain over term does not bar it from obtaining relevant information for another legitimate reason, such as "assessing the validity of a grievance") (quoting *Emery Indus.*, 268 NLRB 824, 825 n.4 (1984)).

The Board also properly rejected, as another attempt to pre-litigate the merits of the Union's grievances (D&O 2 n.4), AMR's "mutual aid" argument. AMR asserts that it could refuse to provide the requested information on New Haven calls handled by non-unit employees because, purportedly, it "had always historically explained, and the Union had always historically accepted, that such work was performed only out of necessity for mutual aid." (Br. 47-48.) As with the disaster-provision defense, the Board correctly identified that determining whether and how the parties' supposedly established practice regarding mutual aid affects AMR's contractual obligations would amount to inappropriately addressing the merits of the Union's grievances. (D&O 2 n.4.)

In any event, as shown (pp. 6-14, 22-24), the Union repeatedly complained, then investigated and filed grievances because, based on its observations, it doubted that AMR was limiting the use of non-unit crews in New Haven to mutual-aid situations. Therefore, it is disingenuous for AMR to claim (Br. 47-48) that the Union had "always historically accepted" and "never challenged" AMR's characterization of its practices as conforming to mutual-aid limitations. The

Union was entitled to receive requested information that would aid its

investigation, and to test for itself the accuracy of AMR's claims.  Contrary to

AMR (Br. 47-48), the Union was not required to accept AMR's explanation or its

assertion that it had already provided the Union with the "information necessary"

to assess AMR's veracity (i.e., Schietinger's explanation of one instance of non-

unit employees working in New Haven).  *See Crozer-Chester Med. Ctr. v. NLRB*,

976 F.3d 276, 290 (3d Cir. 2020) (union entitled to information to "verify or

substantiate" employer's representations); *E.I. du Pont de Nemours & Co. v.

NLRB*, 489 F.3d 1310, 1316 (D.C. Cir. 2007) (well established that "union is

entitled to inspect the data relied on by employer and does not have to accept the

employer's bald assertions . . . at face value").[16]

**C.    The Board Acted Well Within Its Broad Remedial Discretion in
Ordering AMR To Produce the Relevant, Requested Information**

Having found that AMR failed to provide relevant, requested information,

---

[16]  In its brief, AMR does not dispute—and has therefore waived any right to challenge—the Board's reasonable finding that "the Union's processing of the 2019 grievance without the [requested] information does not show that this information is unnecessary now."  (D&O 2 n.4.)  *See Leonard B. Herbert*, 259 NLRB 881, 884-86 (1981) (rejecting argument that information is unnecessary because the union had not previously requested it), *enforced* 696 F.2d 1120 (5th Cir. 1983).  As shown, the 2019 grievance was informally resolved when AMR promised to limit non-unit employee performance of unit work to mutual-aid situations, and the Union requested information and filed more grievances in 2020 when it had reason to doubt AMR was keeping that promise.

the Board ordered AMR to produce that information. AMR argues (Br. 42-45) that the Board abused its discretion in ordering the production of relevant, requested call-volume data without requiring that the parties first bargain to ensure any production accommodates AMR's asserted confidentiality interest in that data, which it claims is "proprietary." To the contrary, the production remedy is well within the Board's remedial discretion.[17]

The Board's authority in formulating remedies "is a broad discretionary one, subject to limited judicial review." *Fibreboard Prods. Corp. v. NLRB*, 379 U.S. 203, 216 (1964). The Board's Order directing AMR to provide relevant, requested call-volume information must be enforced, unless AMR shows that it "is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Id.* (citation omitted). *Accord Wyman Gordon Pa., LLC v. NLRB*, 836 F. App'x 1, 5, 10-11 (D.C. Cir. 2020); *Advancepierre Foods v. NLRB*, 966 F.3d 813, 818, 820 (D.C. Cir. 2020). AMR fails to meet that heavy burden because, as the Board found (D&O 2 n.5, 13), AMR waived its confidentiality

---

[17] To the extent AMR intends to argue (Br. 41-42) a confidentiality defense to producing any call-volume data at all, it does not complete that argument. AMR has never—even in its brief to this Court—claimed that, or explained how, any confidentiality interest it might have entirely outweighs the Union's significant statutory interest in accessing the data to investigate and file grievances. As described below (pp. 44-45), and as AMR acknowledges (Br. 31), that balancing of interests is a required element of a confidentiality defense.

defense by failing to timely assert or substantiate a confidentiality interest

outweighing the Union's interest in the information, or to propose an

accommodation to the Union.  Under those circumstances, the Board's decision to

order production of the call-volume data without accommodative bargaining was

well within its discretion.

> **1.**    **To preserve a confidentiality defense, an employer must timely assert, substantiate, and propose a way to accommodate its confidentiality interest**

An employer may limit production of relevant, requested information if it

establishes a confidentiality defense.  To do so, the employer must first

demonstrate a legitimate and substantial countervailing confidentiality interest that

might be compromised by disclosure.  *Detroit Edison Co. v. NLRB*, 440 U.S. 301,

315, 318-20 (1979); *U.S. Testing Co.*, 160 F.3d at 19.  A blanket or generalized

claim of confidentiality is insufficient to satisfy that burden.  *Crozer-Chester Med.

Ctr.*, 976 F.3d at 294; *Lasher Serv. Corp.*, 332 NLRB 834, 834 (2002).

To then justify withholding (or partially withholding) information, the

employer must prove that its demonstrated confidentiality interest outweighs the

union's need for the information withheld.  *Detroit Edison Co.*, 440 U.S. at 310-11,

315, 318-19.  *See Midwest Div.—MMC, LLC v. NLRB*, 867 F.3d 1288, 1293, 1299

(D.C. Cir. 2017) (stating that "absent an overriding need for confidentiality,

employers must furnish" relevant, requested information, and finding no basis to

set aside Board's conclusion that employer's asserted confidentiality interests "do not outweigh" union's need for the information). *See also Resorts Int'l Hotel Casino v. NLRB*, 996 F.2d 1553, 1556-58 (3d Cir. 1993) (employer must establish a legitimate and substantial confidentiality interest that outweighs union's right to relevant information); *Oil Chem. & Atomic Workers*, 711 F.2d at 354, 362 (confidentiality interest does not "absolutely privilege[]" employer "from revealing relevant proprietary or trade secret information"; the Board will typically balance parties' competing interests).

But even if the employer does so, it may not simply refuse to provide the information. It must promptly offer an accommodation and engage, if applicable, in accommodative bargaining with the requesting union. *U.S. Testing Co.*, 160 F.3d at 20-22; *Postal Service*, 364 NLRB 230, 231 (2016), *enforced*, No. 16-1313 (D.C. Cir. Jul. 17, 2017) (unpublished decision on stipulation for consent judgment); *Howard Indus., Inc.*, 360 NLRB 891, 892 (2014). Just as an employer faced with an overbroad request must still provide relevant responsive information, an employer who proves a confidentiality interest covering only a portion of the responsive information must provide the non-confidential information. *Oil Chem. & Atomic Workers*, 711 F.2d at 362.

If an employer fails to timely take the foregoing steps, for example, by waiting until the unfair-labor-practice hearing to clearly articulate its

confidentiality interest, it waives the opportunity to assert a confidentiality

defense.  *See Providence Hosp. v. NLRB*, 93 F.3d 1012, 1020-21 (1st Cir. 1996)

("[I]t is untimely for an employer to raise a confidentiality objection to an

information request for the first time after proceedings before the Board have been

commenced."); *Gen. Elec. Co. v. NLRB*, 916 F.2d 1163, 1169 (7th Cir. 1990)

(party's justifications for refusing to provide requested information "must be

examined at the time of the demand and refusal," not at the time of the hearing);

*Detroit Newspaper Agency*, 317 NLRB 1071, 1072 (1995) (confidentiality claim

untimely when first raised during or right before hearing) .

## 2.    AMR failed to preserve any confidentiality defense to producing the call-volume data

The Board reasonably found that AMR failed to timely satisfy its burden to

establish a confidentiality defense to producing the call-volume data, and therefore

waived the defense.  (D&O 2 n.5, 13).  As the Board observed, AMR's response to

the Union's information request simply stated that the call-volume data was

"proprietary in nature."  (D&O 2 n.5, 13; GCX 12.)  At that time, AMR did not

offer any explanation of what made the requested information "proprietary" or

which confidentiality interests might be harmed by disclosure, much less attempt

to demonstrate that such interests outweighed the Union's need for the

information.  *See Mission Foods*, 345 NLRB 788, 791-92 (2005) (defense rejected

because employer "has only asserted a blanket claim of confidentiality, and has not

established why particular information would trigger specific confidentiality

concerns").  And even if AMR had established a confidentiality interest warranting

restricted production, it failed to propose any accommodation to address that

interest, choosing instead to simply withhold all call-volume information.  Thus,

the Board reasonably found that AMR "did not satisfy its burden of timely

asserting and proving a legitimate confidentiality defense."  (D&O 2 n.5.)

AMR offers nothing that warrants disturbing the Board's well-supported

waiver finding or well-considered remedial Order.  There is no merit to AMR's

claim (Br. 42) that the Board applied the wrong standard in assessing the

confidentiality defense.  Contrary to AMR, the Board did not "imply" that "to gain

protection," an employer must explain "precisely" how its own information could

be used against it.  (Br. 42.)  Rather, the Board found, in accordance with the

settled law described above, that AMR's "bare assertion" of an interest in

protecting "proprietary" information was insufficient to prove a substantial

confidentiality interest.  (D&O 2 n.5.)  *See, e.g., Crozer-Chester Med. Ctr.*, 976

F.3d at 294 (finding that, "[a]t most," employer said requested information was

"confidential and proprietary," and such "naked assertion" is insufficient); *Publ.*

*Serv. Co.*, 364 NLRB 1017, 1019, 1023-25, 1044 (2016) (blanket assertions in

letters and emails merely stating that requested documents are "confidential" were

insufficient); *Postal Service*, 364 NLRB at 230-31, 238-39, 257 (letter advising

only that "documents requested may contain proprietary and/or confidential

information" insufficient); *Lasher*, 332 NLRB at 834 (insufficient for employer to

make "a *claim*" of confidentiality; rather, it "must *establish* confidentiality as a

defense, not merely raise a naked confidentiality claim") (emphasis in original).[18]

As the Board further explained, AMR's vague invocation of the data's

supposedly proprietary nature gave the Union no "meaningful insight" into AMR's

concerns and, thus, did not "equip" the Union to bargain over an accommodation

of the parties' competing interests.  (D&O 2 n.5.)  Given that AMR's

characterization did not even hint at what made the information sensitive, a

contrary finding would have set the bar for invoking a confidentiality defense

vanishingly low.  Accordingly, AMR did not, as it contends (Br. 45), meet its

obligations merely by inviting the Union to ask questions about its various reasons

for refusing to provide the call-volume data.  That attempt to reverse the burden

and require the Union to discern and accommodate AMR's confidentiality interest

is contrary to settled law, and for good reason.  As this Court has explained, the

"onus" of suggesting a reasonable accommodation of the parties' competing

---

[18] AMR (Br. 42) miscites *Detroit Newspaper* as holding that the employer did not
have to elaborate on its confidentiality defense.  In fact, the Board in that case
found the employer's confidentiality claim was not timely raised when first made
during or shortly before the Board hearing.  317 NLRB at 1072.

48

interests "is on the employer because it is in the better position to propose how it

can best respond to a union request for information." *U.S. Testing*, 160 F.3d at 21.

Finally, the Board reasonably rejected as untimely (D&O 2 n.5) AMR's

attempt to cure its inadequate contemporaneous invocation of the call-volume

data's proprietary nature by relying on an explanation Schietinger first articulated

at the unfair-labor-practice hearing.  (Br. 41, 44 n.11.)  It is of no moment whether,

as AMR asserts (Br. 42), the explanation was unrefuted.  As the Board explained,

it is "untenable as a matter of policy" to allow the party resisting disclosure of

information to "withhold justifications for an assertion of confidentiality" until an

allegedly unlawful failure to provide information is adjudicated.  (D&O 2 n.5.)

Allowing such belated confidentiality defenses and then "begin[ning]

accommodative bargaining from square one at the remedial stage is at odds with

the duty to timely seek accommodations and would incentivize [the party

withholding information] to drag out disputes while enjoying the unjust benefits of

the delays."  (D&O 2 n.5.)  *See Postal Service*, 364 NLRB at 230-31; *Delaware*

*Cty. Mem. Hosp.*, 366 NLRB No. 28, slip op. at 1 n.2, 2018 NLRB LEXIS 118, at

**2 n.2 (2018), *enforced in relevant part sub. nom. Crozer-Chester Med. Ctr. v.*

*NLRB*, 976 F.3d 276 (3d Cir. 2020).

Indeed, as the Board has recognized, and AMR concedes (Br. 43),

incentivizing timely and productive accommodative bargaining is an important

policy goal.  (D&O 3 n.5, citing *Nexstar Broad., Inc. d/b/a KOIN-TV*, 367 NLRB No. 117, slip op. at 1 n.2, 2019 NLRB LEXIS 245, at **2 n.2 (2019).)  *See Oil Chem. & Atomic Workers*, 711 F.2d at 362 (noting Board's "accommodative philosophy" is meant to encourage "meaningful bargaining over the conditions under which . . . proprietary information *might* be disclosed") (emphasis in original); *Providence Hosp.*, 93 F.3d at 1020-21 (requiring timely confidentiality objections ensures "fair opportunity" for accommodative bargaining and "represents a responsible application of the statutory duty to bargain in good faith").

### 3.    The Board reasonably ordered full production of the call-volume data rather than accommodative bargaining

Having found that AMR waived its confidentiality defense, the Board reasonably ordered (D&O 2 n.5, 3, 14) AMR to produce the relevant, requested call-volume data, rather than order the parties to engage in accommodative bargaining.  In doing so, the Board did not "depart[] from its standard course of action," as AMR wrongly claims (Br. 43).  Rather, as just shown, the Board applied settled law and reasonably declined to reward AMR's obfuscation and delay by excusing AMR's waiver of its claimed confidentiality defense.  *See, e.g., Postal Service*, 364 NLRB at 230-31, 237-40 (accommodative-bargaining order inappropriate where employer waived defense by belatedly asserting generalized claim of confidentiality, then delaying further before offering accommodation);

*Lasher Serv. Corp.*, 332 NLRB at 834 (same); *Detroit Newspaper*, 317 NLRB at 1072, 1074, 1078 (same).

AMR asserts that three of the many cases the Board cited in support of that waiver finding and choice of remedy are distinguishable because, in those three cases, the employers failed to either assert or sufficiently prove their confidentiality interests.  (Br. 44, citing *Detroit Newspaper,* 317 NLRB at 1072; *Lasher,* 332 NLRB at 834; *Postal Serv*., 364 NLRB at 231).  But its distinction of those cases depends, as the Board explained (D&O 2 n.5), on AMR's mistaken view that its bare assertion of the call-volume data's proprietary nature was sufficient to preserve its confidentiality defense.  Moreover, AMR ignores the many other cases the Board cited, which further evidence its regular practice of ordering full production of relevant, requested information where, as here, an employer fails to timely assert and establish a confidentiality (or other) defense or offer an accommodation.  (D&O 2 n.5, citing *Mondelez Global LLC,* 5 F.4th 759, 764, 773-75 (7th Cir. 2021), *enforcing* 369 NLRB No. 46, 2020 NLRB LEXIS 142 (2020); *Providence Hosp.*, 93 F.3d at 1020-22; *Publ. Serv. Co.*, 364 NLRB at 1019, 1024-26; *Mission Foods*, 345 NLRB at 791-93); *see also Resort Int'l*, 996 F.2d at 1554-60; *Howard Indus.*, 360 NLRB at 892-93.[19]

---

[19]  AMR's argument also presumes that Schietinger's explanation at the hearing was sufficient to establish a legitimate and substantial confidentiality interest that outweighs the Union's interest in seeing the call-volume data.  However, because it

AMR gains no ground (Br. 44-45) by citing two cases where the Board exercised its discretion to order accommodative bargaining instead of full disclosure. Both are distinguishable, as the Board explained. (D&O 2 n.5.) In each, the Board found that the employer—unlike AMR—had timely invoked an arguably legitimate confidentiality interest in its contemporaneous response to an information request. *See Minnesota Mining & Mfg. Co.*, 261 NLRB 27, 39 (1982) (employer raised concerns about "disclosure of trade secrets" to competitors in response to request), *enforced sub nom.*, *Oil Chem. & Atomic Workers*, 711 F.2d 348, 353 (D.C. Cir. 1983) (employer's response "crystallized" in meeting with union where employer claimed disclosure "might reveal trade secrets"); *mi. Co.*, 330 NLRB 107, 107 (1999) (employer objected in response to request that disclosure of employee informants' names could subject them to retaliation). Here, by contrast, AMR failed to identify its purported confidentiality interest in a manner sufficient to give the Union an "opportunity to evaluate the nature or legitimacy of [AMR's] confidentiality interest and discuss it with [AMR]." (D&O 2 n.5.)

---

found AMR's confidentiality claim waived, the Board did not reach or resolve that issue. In the event the Court disagrees with the Board's waiver finding, it should therefore remand the case to the Board to determine, in the first instance, whether and to what extent the confidentiality interest asserted at the hearing might appropriately limit AMR's production of call-volume data.

AMR argues (Br. 44-45) that the employer's explanation of its "trade secrets" concern in *Minnesota Mining* was no more specific than AMR's bare reference to the proprietary nature of the call-volume data. However, as the Board explained, it evaluates asserted confidentiality interests in light of the circumstances of each case (D&O 13, citing *N. Indiana Publ. Serv. Co.*, 347 NLRB 210, 211 (2006)), including how such interest "may vary with the nature of the industry." *Met. Ed.*, 330 NLRB at 108 (citation omitted). In *Minnesota Mining*, the employer's highly technical manufacturing process used a particular combination of chemicals. *See* 261 NLRB at 31-32, 36-39. And the employer expressly told the union, in response to the request, that it feared disclosure of the requested information (the generic names of those chemicals) would divulge that trade secret to its competitors.[20] *Id.* at 39.

AMR claims only that Schietinger, in his hearing testimony, belatedly explained that he considered the call volume's "sensitivity . . . so great" that AMR took steps not to disclose it and contends, without elucidation, that the data "could provide a competitive advantage" to commercial rivals. (Br. 41-42.) But it is

---

[20] Likewise, in *Met. Ed.*, supra, it would be readily apparent why disclosure of names of confidential informants, whose cooperation led to discharges, might lead to retaliation. *See N. Ind.*, 347 NLRB at 211 (noting confidential information may include "that which could reasonably be expected to lead to harassment or retaliation, such as the identity of witness").

53

unclear from AMR's brief why that is so, and it certainly would have been unclear
to the Union when it was interpreting AMR's vague invocation of a "proprietary
nature."  In context—and arguably in general—the term "trade secret" is
reasonably understood as more specific than, or a subset of, "proprietary,"
suggesting technical or secret information about the content or creation of a
product, rather than simply ownership.[21]

In sum, substantial evidence supports the Board's finding that AMR failed to
take the steps necessary to preserve its confidentiality claim.  AMR not only failed
to substantiate its purported confidentiality interest in the call-volume data, but
also did not—including in its brief to this court—even argue that any such interest
outweighed the Union's investigatory interest or propose a disclosure
accommodation.  The Board did not abuse its broad remedial discretion in ordering
disclosure of the call-volume data and in declining to take the unusual step (under
those circumstances) of ordering belated accommodative bargaining.

---

[21]  Whereas a "trade secret" is "something (such as a formula)" whose economic
value depends on "maintain[ing its] secrecy"—such that the term itself suggests
that divulging the secret may cause competitive harm—"proprietary," in contrast,
more broadly refers to one who "owns, or holds exclusive right to something."  *See*
Trade Secret Definition & Meaning - Merriam-Webster; Proprietary Definition &
Meaning - Merriam-Webster.

# CONCLUSION

The Board respectfully requests that the Court deny AMR's petition for review and enforce the Board's Order in full.

Respectfully submitted,

/s/ Kira Dellinger Vol
KIRA DELLINGER VOL
*Supervisory Attorney*

/s/ Greg P. Lauro
GREG P. LAURO
*Attorney*

National Labor Relations Board
1015 Half Street SE
Washington, DC 20570-0001
(202) 273-0656
(202) 273-2965

JENNIFER A. ABRUZZO
    *General Counsel*

PETER SUNG OHR
    *Deputy General Counsel*

RUTH E. BURDICK
    *Deputy Associate General Counsel*

DAVID HABENSTREIT
    *Assistant General Counsel*

National Labor Relations Board
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| AMERICAN MEDICAL RESPONSE OF CONNECTICUT, INC. | ) ) ) | Case Nos.  22-1261<br>22-1283 |
| Petitioner/Cross-Respondent | ) ) | |
| v. | ) ) | Board Case No.<br>01–CA–263985 |
| NATIONAL LABOR RELATIONS BOARD | ) ) | |
| Respondent/Cross-Petitioner | ) ) | |

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the Board

certifies that its brief contains 12,303 words of proportionally-spaced, 14-point

type, and the word processing system used was Microsoft Office 365.


/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, SE
Washington, DC 20570-0001
(202) 273-2960


Dated at Washington, DC
this 23rd day of March 2023

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | | |
|---|---|---|---|
| AMERICAN MEDICAL RESPONSE OF CONNECTICUT, INC. | ) | Case Nos. | 22-1261 |
| | ) | | 22-1283 |
| Petitioner/Cross-Respondent | ) | | |
| | ) | | |
| v. | ) | Board Case No. | |
| | ) | 01–CA–263985 | |
| NATIONAL LABOR RELATIONS BOARD | ) | | |
| | ) | | |
| Respondent/Cross-Petitioner | ) | | |
| | ) | | |

**CERTIFICATE OF SERVICE**

I hereby certify that on March 23, 2023, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. I certify that the foregoing document was served on all parties or their counsel of record through the appellate CM/ECF system.

/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, SE
Washington, DC 20570-0001
(202) 273-2960

Dated at Washington, DC
this 23rd day of March 2023